# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Misc. Case No.  1:23-mc-468 |
| DIAMOND SPORTS GROUP, LLC, *et al.,* | ) |
| [1] | ) |
| Debtors. | ) Chapter 11 |
| | ) |
| DIAMOND SPORTS GROUP, LLC, *et al.* | ) |
| Plaintiffs, | ) |
| | ) (Jointly Administered) |
| v. | ) |
| | ) BANKRUPTCY COURT FOR THE |
| SINCLAIR  BROADCAST GROUP, INC., *et al.* | ) SOUTHERN DISTRICT OF TEXAS |
| | ) HOUSTON DIVISION |
| Defendants. | ) S.D. Tex. Case No. 23-90116 |
| | ) |
| | ) Adv. Prn. No. 23-03134 |
| | ) |

## SINCLAIR BROADCAST GROUP, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR TRANSFER OR FOR AN ORDER COMPELLING DOCUMENT PRODUCTION

---

[1]  A complete list of each of the debtors in these chapter 11 cases (collectively, the "Debtors" or "Diamond") may be obtained on the website of the Debtors' claims and noticing agent at https://cases ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

JURISDICTION AND VENUE ................................................................................................ 3

BACKGROUND ..................................................................................................................... 3

    A.    MLB and the Teams Likely Possess Information Relevant to Actual Intent and Solvency ................................................................................................................ 4

    B.    Sinclair Subpoenas MLB and the Teams to Obtain the Relevant Information in Their Possession ...................................................................................................... 6

    C.    MLB and the Teams, Acting Under MLB's Direction, Largely Refuse to Produce the Information Sought ......................................................................................... 8

ARGUMENT ........................................................................................................................... 9

I.    The Motion to Compel Should Be Transferred to the Bankruptcy Court Overseeing the Underlying Action ............................................................................................................ 9

II.    Alternatively, this Court Should Grant the Motion to Compel .......................................... 11

    A.    The Requests Are Relevant to Central Disputes in This Case ............................... 12

        1.    Requests Bearing on Manfred's Credibility and Motivations Seek Information Relevant to Actual Intent to Defraud ................................... 12

        2.    Requests Bearing on Diamond's Financial Condition Seek Information Relevant to Solvency ................................................................................ 15

    B.    MLB and the Teams Have Made No Showing that the Requests Are Burdensome ..................................................................................................................... 19

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Am. Plan Administrators v. S. Broward Hosp. Dist.*, 39 F.4th 59 (2d Cir. 2022) ........................ 9

*Cobell v. Norton*, 213 F.R.D. 16 (D.D.C. 2003) ........................................................... 13

*Crosby v. City of New York*, 269 F.R.D. 267 (S.D.N.Y. 2010) ...................................... 12

*Domain Prot., LLC v. Sea Wasp, LLC*, No. 4:18-CV-792, 2019 WL 5550620 (E.D. Tex. Oct. 28, 2019).................................................................................................................. 12

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132 (S.D.N.Y. 2012). 11

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99 (S.D.N.Y. 2013) ............................................................................................................................ 19

*Honeywell Int'l Inc. v. Mazars USA LLP*, No. 21 MISC. 870 (ER), 2022 WL 94881 (S.D.N.Y. Jan. 10, 2022) ............................................................................................................ 10

*In re Adkins Supply, Inc.*, 555 B.R. 579 (Bankr. N.D. Tex. 2016) ............................... 11

*In re Adkins Supply, Inc.*, 555 B.R. at 590.................................................................. 19

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798 (S.D. Tex. 2009) ....... 12

*In re Grabis*, No. 13-10669 (JLG), 2018 WL 6132045 (Bankr. S.D.N.Y. Nov. 20, 2018).... 11, 19

*In re HDD Rotary Sales, LLC,* 499 B.R. 542 (Bankr. S.D. Tex. 2013)........................................ 18

*In re Morreale Hotels LLC* 517 B.R. 184, (Bankr. C.D. Cal. 2014) ............................................ 18

*In re Plassein Int'l Corp.*, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008)....................... 16, 18

*In re Plassein International Corporation 513 B.R. at 662* ........................................................... 18

*In re Roblin Industries, Inc.*, 78 F.3d 30 (2d Cir. 1996) ............................................................ 18

*In re SemCrude, L.P.*, 2013 WL 2490179 (Bankr. D. Del. June 10, 2013) ................................. 16

*In re Wade*, 2012 WL 5449308 (Bankr. S.D. Tex. Nov. 7, 2012)........................................ 11, 19

*Kipperman v. Onex Corp.*, 2010 WL 11505688, (N.D. Ga. Sept. 29, 2010)............................... 16

*McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482 (5th Cir. 1990)) ........... 11

*S.E.C. v. Brady*, 238 F.R.D. 429 (N.D. Tex. 2006) ................................................................... 19

*Sec. & Exch. Comm'n v. Archer*, No. 16-CV-3505, 2018 WL 3424449 (S.D.N.Y. July 2, 2018)12

*Thong v. Andre Chreky Salon*, 247 F.R.D. 193 (D.D.C. 2008) .................................................. 13

*United States v. Abel*, 469 U.S. 45 (1984) ................................................................................. 14

*Wilkerson v. Cain*, 233 F.3d 886 (5th Cir. 2000) ........................................................................ 14

*Winston & Strawn LLP v. Janssen Prod., L.P.*, No. 22-MC-0114 (ALC) (OTW), 2022 WL 3359564 (S.D.N.Y. Aug. 12, 2022) ...................................................................................... 9

*Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) ................................... 11

**Rules**

Bankruptcy Rule 7026 ................................................................................................................ 11

Fed R. Civ. P. 26(b)(1) .......................................................................................................... 11, 12

Fed. R. Civ. P. 45 ................................................................................................................ 3, 9, 10

Local Rule 83.1 .......................................................................................................................... 11

## PRELIMINARY STATEMENT

1.      Sinclair Broadcast Group, Inc. ("Sinclair") seeks the Court's aid in obtaining discovery from third-party Major League Baseball ("MLB").[2]  Despite the clear relevance of the discovery sought, MLB has refused to produce it, without even attempting to show that complying with the subpoena would impose an undue burden.  The Court should transfer this motion to the issuing court for a ruling on the motion or, in the alternative, compel full production.

2.      In the midst of the Debtors' dispute with MLB over the Debtors' payment of rights fees to certain Teams, MLB's Commissioner, Robert Manfred, gratuitously claimed that in 2021, Sinclair's Chairman David Smith allegedly admitted to a plan to "milk" Diamond of assets.  This testimony had no bearing on MLB's dispute with the Debtors, but MLB and Manfred made the affirmative choice to repeat the testimony not only during Manfred's deposition, but then again during a public hearing.  Unsurprisingly, the Debtors have made that sharply contested testimony the centerpiece of their actual fraud claims against Sinclair, through which the Debtors seek $1.5 billion in damages.  The veracity of Manfred's testimony is thus a central point of dispute in this case.  But having chosen to insert itself into the case through Manfred's testimony, MLB now refuses to provide virtually any discovery related to Manfred's credibility (and has apparently directed the Teams to do the same).

3.      Sinclair has also sought documents from MLB and the Teams that bear directly on the question of Diamond's solvency.  Diamond's broadcast rights for baseball games and its

---

[2]  The Sinclair Defendants have also sought discovery from fourteen major league baseball teams: the Arizona Diamondbacks, Atlanta Braves, Cincinnati Reds, Cleveland Guardians, Detroit Tigers, Kansas City Royals, Los Angeles Angels, Miami Marlins, Milwaukee Brewers, Minnesota Twins, St. Louis Cardinals, San Diego Padres, Tampa Bay Rays, and Texas Rangers (the "Teams").  Although this motion is not brought against the Teams specifically, the Sinclair Defendants reserve the right to move to compel discovery responses from each of the Teams within the compliance court for the subpoenas served on them pursuant to Federal Rule of Civil Procedure 45.

relationship with MLB and the Teams is one of the central drivers of Diamond's value.  The information these requests seek all bear on Diamond's financial condition and is appropriately sought from MLB and the Teams given their close business relationship with Diamond and the dispute in the underlying adversary proceeding over the reasonableness of Diamond's internal projections and solvency analyses.  Again, however, MLB has refused to produce documents in response to these requests (and apparently directed the Teams to do the same).

4.      MLB and the Teams have not attempted to make a showing of any undue burden or expense in responding to these targeted requests.  Instead, they have argued that the relevance of the information sought is attenuated, or that the evidence sought would not support the inferences that Sinclair would ask a fact-finder to draw from that evidence.  As a preliminary matter, MLB and the Teams are wrong about the strength of the inferences the requested information would support.  But more importantly, their arguments are irrelevant to whether MLB and the Teams are required to respond to the requests: because the requests clearly seek relevant information, MLB and the Teams must establish an undue burden to avoid complying with the subpoenas.  They cannot do so.  MLB should be compelled to respond to the subpoenas in full—and it will be up to the factfinder to weigh the evidence after it has been produced.

5.      Rather than rule on this motion, however, this Court should transfer it to the Southern District of Texas Bankruptcy Court, where the underlying dispute is pending.  Sinclair filed this motion in the Southern District of New York because that is the compliance court for purposes of the subpoena Sinclair served on MLB, calling for production in this District.  But this Court is authorized to transfer the motion back to the issuing Court, including on the basis of MLB's consent, which Sinclair has obtained.  Given the parties' agreement and the issuing court's greater familiarity with the subject matter of this dispute, Sinclair respectfully requests

2

that the motion be transferred on consent.  In the alternative, the Court should grant the motion.

6.      Emergency relief is needed because the fact discovery cut-off is January 26, 2024. If this motion to compel is not decided on an expedited timeline, there is a material risk it would not be decided in time for Sinclair to make use of any additional materials the Court compels MLB to produce.  Sinclair therefore respectfully seeks the Court's attention on an emergency basis.

## JURISDICTION

7.      This Court has jurisdiction to enforce the subpoena served upon MLB.  Pursuant to Rule 45(d), "the serving party may move the court for the district where compliance is required for an order compelling production or inspection."  Fed. R. Civ. P. 45(d)(2)(B)(i).  As the subject subpoena was served in New York, where MLB is headquartered,[3] this Court is the appropriate compliance court.  *See* Ex. 1 (subpoena); Ex. 2 (affidavit of service).

## BACKGROUND

8.      The Debtors brought this adversary proceeding against the Sinclair Defendants[4] seeking approximately $1.5 billion in damages.  ECF No. 2 ("Compl."),[5] at ¶¶ 1, 359, 366. Several of the principal claims are relevant to this motion.  *First*, Debtors seek damages for actual fraudulent conveyance, which requires, among other things, a showing that the Debtors had an actual intent to hinder, delay or defraud Diamond's creditors when certain payments or transactions involving Sinclair were undertaken.  Compl. ¶¶ 248-256; *see also* ECF No. 38 ("Sinclair MTD"), at 40.

---

[3] Major League Baseball, About MLB, https://www.mlb.com/official-information/about-mlb.
[4] The "Sinclair Defendants" are Defendants Sinclair Broadcast Group, Inc., Sinclair Television Group, Inc., Diamond Sport TopCo LLC, Diamond Sports Holdings LLC, Diamond Sports Intermediate Holdings A LLC, Diamond Sports Intermediate Holdings LLC, (collectively, "Sinclair"), David Smith, Christopher Ripley, Lucy Rutishauser and Scott Shapiro.
[5] References to ECF No.'s refer to the ECF No.'s in the underlying adversary proceeding.

9.     *Second*, Debtors seek damages for constructive fraudulent conveyance and illegal distributions, both of which require, among other things, a showing that Diamond was insolvent when certain payments or transactions involving Sinclair were undertaken.  Compl. ¶¶ 257-265, 271-276; *see also* Sinclair Defs.' MTD at 43, 51.  Assuming the Sinclair Defendants' motion to dismiss is not granted as to these claims, both actual intent to defraud and solvency will be sharply disputed issues in the case.

### A.  MLB and the Teams Likely Possess Information Relevant to Actual Intent and Solvency

10.     MLB and the Teams are key players in this dispute.  Sinclair narrowly outbid MLB to acquire Diamond in August 2019: MLB bid approximately $9.6 billion to Sinclair's $10.5 billion.  Compl. ¶ 38; Ex. 3 ("Manfred Hearing Tr."), at 224:4-7.[6]  And ever since it was outbid, MLB has maintained an active interest in the regional sports networks (RSNs) that constituted Diamond's principal asset and the broadcast and related digital rights of those RSNs by virtue of its distribution contracts with the Teams.

11.     Because of those distribution contracts, the Teams were among Diamond's most important business partners throughout the relevant time period.  *See* Compl. ¶ 68 (explaining that baseball season was "the season with the most attractive and valuable content broadcast on the RSNs").  The importance of this relationship went both ways, and MLB and the Teams had an active and ongoing interest in the financial condition and performance of Diamond and the RSNs, which they relied on to broadcast the Teams' games.  ████████████████████ ████████████████████████████████████████████ ██████████████████████████

12.     MLB's interest in the RSNs apparently went beyond mere monitoring, however,

---

[6] All citations to "Ex." refer to the exhibits to the accompanying Declaration of Scott M. Danner submitted herewith.

and extended to considering acquiring the RSNs for MLB's own benefit—just as MLB had tried

(and failed) to do when it was outbid by Sinclair in August 2019.  When Diamond's financial

performance was challenged by "cord-cutting" and other trends, MLB inserted itself into

Diamond's negotiations with the Teams to block Diamond from acquiring digital rights that

would make the distribution contracts more valuable to Diamond and put Diamond on a surer

financial footing.  ███████████████████████████████

███████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

███████████████████████  After the failure of negotiations between Diamond and the Teams,

Diamond declared bankruptcy.

13.    MLB has also inserted itself in these bankruptcy proceedings, where control of

the RSNs—Diamond's principal assets—remains at stake.  Testifying on unrelated matters,

Manfred, largely unprompted, told a tale wherein Sinclair's Chairman, Mr. Smith, purportedly

told Manfred that he intended use Sinclair's ownership of Diamond to "milk" the company through the extraction of management fees and other payments.  Ex. 4 (Manfred Depo. Tr.) at 46:4-8; Ex. 3 (Manfred Hearing Tr.) at 221:18-223:7.  Mr. Smith denies making these statements.  *See* Ex. 5 (Smith Tr.) at 126:7-131:6.  Manfred also repeatedly expressed his vitriol for Sinclair and Mr. Smith, █████████████████████████████████████

████████████████████████████████████████   ████████████████

████████████████████████████████████████████████

███████████████████████████████████

14.      The Debtors have since seized on Manfred's self-interested testimony as the centerpiece of their actual fraudulent conveyance claim against the Sinclair Defendants.  They cited that testimony more than a dozen times in their adversary complaint.  Compl. ¶¶ 1, 8, 106, 159, 196, 254, 281, 359, 366, 372, 379.  Then, they used his testimony to oppose the Sinclair Defendants' (pending) motion to dismiss, calling Manfred's testimony "***direct evidence*** of fraudulent intent," ECF No. 70 ("MTD Opp."), at 6 (emphasis in original), and a "credible" and "damning admission," conveyed by no less a personage than the "Commissioner of Major League Baseball," *id.* at 6 and 33.

### B.  Sinclair Subpoenas MLB and the Teams to Obtain the Relevant Information in Their Possession

15.      The Sinclair Defendants intend to discredit Manfred's story, which, as noted, Mr. Smith flatly denies.  The Sinclair Defendants also intend to prove that Diamond was not insolvent at the time of the challenged transfers on a fair view of its financial condition at the time the transfers were made.  Because MLB and the Teams are likely to have relevant information concerning both issues, Sinclair served narrowly tailored subpoenas seeking information relevant to both issues.  *See* Ex. 1 (MLB Subpoena); Ex. 6 (KC Royals Subpoena,

which is identical to subpoenas served on the other Teams).

16.     The subpoenas' requests fall into two principal categories.  One set of requests seeks documents relating to the motivations (and thus, credibility) of Manfred's testimony, including documents related to MLB (and the Teams') views of Sinclair's and Diamond's management of the RSNs; documents related to the disputed contract negotiations between the Teams and Diamond, into which Manfred inserted himself and MLB; and documents related to conversations between MLB's personnel and Sinclair's personnel.  *See* Ex. 6 (KC Royals Subpoena), RFP Nos. 3, 4, 5, 6, 7, and 9; *see also* Ex. 1 (MLB Subpoena), RFP Nos. 3, 4, 5, 6, 8. Each of these requests seek documents that bear directly on MLB's (and Manfred's) motivations to harm Diamond's business and obtain control over the RSNs—including through a bankruptcy proceeding—as well as Manfred's ill-will toward Sinclair and its Chairman, ███████████

█████████████████████████████████████████████

██ ████████████████████████████████████████

████████████████████████████ ).

17.     The second set of requests seeks documents relating to Diamond's solvency over time, which is indisputably a relevant issue in this case.  These include requests seeking documents relating to MLB's bid in 2019, including its valuation of the RSNs as of August 2019; assessments of MLB's proposal to acquire the RSNs; evaluations of Diamond's financial condition; and the same negotiations over broadcasting rights and other rights, which were critical to Diamond's financial condition and bear on the reasonableness of Diamond's analyses of its solvency while the negotiations were underway.  *See* Ex. 6 (KC Royals Subpoena), RFP Nos. 1, 2, 5, 8; Ex. 1 (MLB Subpoena), RFP Nos. 1, 2, 3, 4, 7.

### C. MLB and the Teams, Acting Under MLB's Direction, Largely Refuse to Produce the Information Sought

18.     Despite the clear relevance of the subjects the subpoenas seek to explore, MLB and the Teams have largely refused to produce documents.  And it appears that the Teams have done so under direction from the MLB.

19.     Shortly after these subpoenas were served, several teams reached out to the undersigned counsel to discuss responses, including the Atlanta Braves.  *See* Danner Decl. ¶ 7. Preliminary discussions with counsel for the Braves on October 6, 2023 indicated that the Braves had reviewed the subpoena and did not identify any substantive objection to the subpoena's requests, but would work with Sinclair to address scope and burden concerns.  *Id.*  The Braves abruptly changed their tune, however, after a call apparently convened by counsel for MLB, during which the Teams were informed that MLB would be interposing blanket objections on the Teams' behalf (the specific nature of which was unknown to the Braves' counsel).  *Id.* Following MLB's intervention, the Teams ceased communicating with Sinclair's counsel, and MLB served blanket objections that identified no responsive documents that either MLB or the Teams would produce and offered no compromise.  *See* Exs. 7 and 8 (R&Os for MLB and KC). All communications with MLB and the Teams have since been through MLB's counsel, who claims authority to speak for all the Teams.

20.     Despite the blanket objection, Sinclair has tried in good faith to meet and confer and seek a compromise.  Those discussions have resulted in an agreement by MLB to produce a subset of documents in response to MLB RFP No. 1 concerning MLB's valuations of Diamond in connection with its bids (which, again, bear on solvency) and a subset of documents in response to MLB RFP No. 8 concerning Manfred's meeting with Mr. Smith (which, again, bear on intent to defraud).  Danner Decl. ¶¶ 9-11.  But despite acknowledging the relevance of these

subjects, MLB and the Teams continue to refuse to produce any documents in response to other requests that also bear on the same hotly contested issues. *See* Danner Decl. ¶¶ 9-14.  In doing so, MLB and the Teams have not identified, let alone substantiated, any undue burden in responding to these additional requests, despite Sinclair's repeated invitations to engage in a productive dialogue concerning scope and burden concerns.

21.     On November 30, 2023, Sinclair informed MLB that it intended to move to compel in this Court, and requested MLB's consent to transfer the motion to the Southern District of Texas, where the underlying dispute is pending, pursuant to Fed. R. Civ. P. 45(f). Danner Decl. ¶¶ 15-16.  On December 1, MLB consented to the transfer.

## ARGUMENT

I.  **The Motion to Compel Should Be Transferred to the Bankruptcy Court Overseeing the Underlying Action**

22.     Rule 45(f) provides that a compliance court can transfer a motion to compel a third party subpoena response to the court from which the subpoena was issued, either on consent or a finding of extraordinary circumstances.  Here, both bases are present.

23.     As noted, MLB consents to the transfer, which is alone sufficient.  *See Winston & Strawn LLP v. Janssen Prod., L.P.*, No. 22-MC-0114 (ALC) (OTW), 2022 WL 3359564, at *1 (S.D.N.Y. Aug. 12, 2022).

24.     Moreover, the circumstances here would warrant transfer even absent consent. As the Advisory Committee Notes provide, "transfer may be warranted [under Rule 45(f)] in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts.'"  *Am. Plan Administrators v. S. Broward Hosp. Dist.*, 39 F.4th 59, 60 (2d Cir. 2022).  Here, Sinclair is moving against MLB in this Court on the relevance

of several requests that overlap materially with the requests in the 14 subpoenas issued to the Teams.  To avoid unnecessary duplication and the risk of inconsistent decisions, all disputes concerning the subpoenas at issue here should be resolved by the issuing court.  Courts in this district have "transferred similar motions due to 'the posture and complexity of the underlying action,' 'risk of conflicting rulings,' . . . to avoid unnecessary delay[,] where the judge in the underlying case has already been managing discovery, and where that judge has more knowledge of the case that would help resolve the issues." *Honeywell Int'l Inc. v. Mazars USA LLP*, No. 21 MISC. 870 (ER), 2022 WL 94881, at *1 (S.D.N.Y. Jan. 10, 2022) (collecting cases) (international citations omitted).

25.    Moreover, the present motion is part of a complex adversary proceeding stemming from an ongoing bankruptcy matter, where a number of interrelated proceedings are before Judge Lopez of the U.S. Bankruptcy Court for the Southern District of Texas.  Judge Lopez has overseen that bankruptcy proceeding since March 2023, as well as the adversary proceeding since July 2023, which has included multiple hearings in the bankruptcy proceeding and disputes between MLB itself and the Debtors.  Notably, Judge Lopez even presided over a multi-day public hearing at which the key witness at the heart of this motion, Manfred, testified at length about certain of the topics at issue.  As noted above, fact discovery in the adversary proceeding ends on January 26, 2024, meaning Sinclair needs a ruling on this motion in short order to utilize any materials MLB may be compelled to produce.  Judge Lopez is well acquainted with the issues underlying the motion and thus well positioned to rule on a motion most expeditiously in light of the looming fact discovery cutoff.

26.    Accordingly, prompt transfer pursuant to Rule 45(f) is warranted and Sinclair respectfully requests that the Court order that this case be transferred immediately, without

regard to Local Rule 83.1.

## II.  Alternatively, this Court Should Grant the Motion to Compel

27.     In the alternative, Sinclair respectfully moves for an order compelling complete

responses to the subpoena's requests for production.  "Non-party discovery is governed by Rule

45 of the Federal Rules of Civil Procedure, which is made applicable to this proceeding by

Bankruptcy Rule 9016."  *In re Grabis*, No. 13-10669 (JLG), 2018 WL 6132045, at *7 (Bankr.

S.D.N.Y. Nov. 20, 2018).  "Under Rule 45(c)(2)(B)(i), as made applicable by Bankruptcy Rule

9016, if a subpoenaed person fails to comply with a subpoena, the requesting party may move

the issuing court for an order compelling compliance with the subpoena."  *In re Wade*, 2012 WL

5449308, at *4 (Bankr. S.D. Tex. Nov. 7, 2012).

28.     Sinclair discharges its burden on this motion by establishing that "the materials

and information it seeks are relevant to the lawsuit or will lead to the discovery of admissible

evidence."  *Id.* (citing *McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482,

1485 (5th Cir. 1990)); *see also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818, 820 (5th

Cir. 2004); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 135

(S.D.N.Y. 2012) ("The burden of demonstrating relevance is on the party seeking discovery. . . .

Once relevance has been shown, it is up to the responding party to justify curtailing discovery.")

(cleaned up).

29.     Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, applicable here

through Bankruptcy Rule 7026, "relevance" is construed broadly, and document requests

"should be considered relevant if there is *any possibility* that the information sought may be

relevant to the claim or defense of any party."  *In re Adkins Supply, Inc.*, 555 B.R. 579, 589

(Bankr. N.D. Tex. 2016) (emphasis in original) (citation omitted).  "Relevance under Rule 26 has

been construed broadly to encompass any matter that bears on, or that reasonably could lead to

other matter that could bear on any issue that is or may be in the case.  The broad scope of discovery delimited by the Federal Rules of Civil Procedure is designed to achieve disclosure of all the evidence relevant to the merits of a controversy."  *Crosby v. City of New York*, 269 F.R.D. 267, 282 (S.D.N.Y. 2010) (cleaned up); *In re Enron Corp. Sec., Derivative & ERISA Litig*., 623 F. Supp. 2d 798, 838 (S.D. Tex. 2009) (same).

30.     Once Sinclair has made a showing of relevance, the burden shifts to MLB "to show why the discovery is irrelevant, overly broad, unduly burdensome or oppressive, and thus should not be permitted."  *Domain Prot., LLC v. Sea Wasp, LLC*, No. 4:18-CV-792, 2019 WL 5550620, at *2 (E.D. Tex. Oct. 28, 2019); *Sec. & Exch. Comm'n v. Archer*, No. 16-CV-3505, 2018 WL 3424449, at *1 (S.D.N.Y. July 2, 2018) (same).

### A.  The Requests Are Relevant to Central Disputes in This Case

31.     Sinclair easily discharges its burden of showing relevancy under the liberal standard of Rule 26, because each of the disputed requests seek documents that bear directly on one of two critical issues in this case (or both): (1) whether Diamond acted with an actual intent to defraud its creditors when engaging in certain transactions involving Sinclair, and (2) Diamond's solvency over time.

#### 1.  Requests Bearing on Manfred's Credibility and Motivations Seek Information Relevant to Actual Intent to Defraud

32.     As shown, Manfred's claim that Mr. Smith told him that Sinclair would "milk" Diamond is the centerpiece of the Debtors' claim that Diamond had an actual intent to defraud its creditors.  Indeed, it is the only piece of "direct" evidence Debtors cite in their opposition to the Sinclair Defendants' motion to dismiss the actual fraudulent conveyance claim.  *See* Pls.' MTD Opp. at 33.  Thus, any information that tends to bear on Manfred's motivations and credibility is fair game, because "discoverable information includes evidence relevant to the credibility of . . .

a key witness." *Thong v. Andre Chreky Salon*, 247 F.R.D. 193, 196 (D.D.C. 2008).  Notably, MLB and the Teams have never disputed that Manfred's credibility is relevant, and they could not credibly do so.  *See, e.g.*, *Cobell v. Norton*, 213 F.R.D. 16, 25 (D.D.C. 2003) ("The Court is also surprised to hear defendants claim that a question that directly bears on the credibility of a key witness . . . is irrelevant.").

33.     Nevertheless, MLB and the Teams have refused to respond to several requests that bear on Manfred's credibility.  Specifically, MLB RFP Nos. 5 and 6 (and Teams RFP Nos. 6, 7, and 9) seek information about MLB's and the Teams' views of Sinclair's and Diamond's management of the RSNs, which are relevant to whether MLB and Manfred harbored a negative view of those management teams (and Mr. Smith in particular) and whether MLB and Manfred believed that they could "make money" by obtaining control over the RSNs.  Such views on MLB's behalf would provide motivation for Manfred's attacks on Sinclair and Mr. Smith, and therefore bear on the credibility of Manfred's testimony.

34.     Similarly, MLB RFP Nos. 3 and 7 (and Teams RFP Nos. 4 and 9), which relate to contract negotiations between Diamond and MLB and the Teams, are also relevant to Manfred's motivations.  These negotiations were critical to Diamond's future financial condition, including because they presented the possibility of Diamond acquiring digital rights that could have materially improved the economics of the RSNs' distribution contracts with the Teams.  MLB's heavy-handed intervention in these negotiations undermined that possibility and contributed to Diamond's eventual bankruptcy, which now presents a prime opportunity for MLB to obtain the RSNs after it failed to outbid Sinclair in August 2019.  Documents concerning MLB's role in these negotiations thus bear directly on MLB's ongoing effort to undermine Sinclair (and Diamond, under Sinclair's management) to ultimately obtain control over the RSNs.

35.     MLB and the Teams do not seriously contest that Manfred's credibility and motivations are relevant subjects that Sinclair is entitled to explore.  Instead, they argue that the evidence sought by the requests would not convince a factfinder that Manfred had a motivation to lie.  *See, e.g.*, Ex. 9 at 7 (arguing, with respect to Requests 5 and 6, that even if Manfred harbored ill-will toward Mr. Smith, "that certainly would not mean that it impacted his truthful testimony.").  But those are inferences for the factfinder to draw (or refuse to draw) from the evidence—evidence MLB (and the Teams) now seek to withhold from the factfinder's consideration.  That aside, evidence of Manfred's ill-will toward Sinclair (and Mr. Smith personally) would tend to impeach Manfred's credibility, as he has already admitted that he will hold a grudge and use litigation to pursue a vendetta. ██████████████████████

██████████████████████████████████████████

████████████████████████████████████████2, and "would be leading the charge in an effort to recover on both [the management fee and Bally's transaction] claims," Ex. 3 (Manfred Hearing Tr.) at 223:1-7.  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *United States v. Abel*, 469 U.S. 45, 52 (1984); *see also Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000) ("It is axiomatic that . . . counsel should be permitted to expose to the jury facts relative to a witness' . . . potential bias for or against any party," because "[s]uch information is always relevant as discrediting the witness and affecting the weight of his testimony.") (cleaned up).

36.     Manfred's motivation to fabricate his discussion with Mr. Smith is not limited to his personal ill-will, but also arises from MLB's apparent interest in obtaining control of the RSNs out of the Diamond bankruptcy.  As noted above, MLB itself sought to acquire the RSNs

14

in 2019 before it was outbid by Sinclair. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Because MLB has an

admitted economic interest in forcing Diamond into a bankruptcy where it would have leverage

to obtain control over the RSNs from Diamond (and Sinclair), those motivations go to the

credibility of Manfred's testimony. ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ . Thus, the subpoena requests relating to MLB's interference with Diamond's contract

negotiations with the Teams concerning distribution rights—specifically MLB RFP Nos. 3 and 7

(and Teams RFP Nos. 4 and 9)—are relevant to Manfred's motivations as well.

### 2. Requests Bearing on Diamond's Financial Condition Seek Information Relevant to Solvency

37.     The Debtors' claims for constructive fraudulent conveyance and illegal

distributions depend significantly on their claim that Sinclair knew (or reasonably should have

known) that Diamond was insolvent at the time of the challenged transactions.  *See, e.g.*, Compl.

¶ 197 ("Sinclair authorized these massive wealth transfers from DSG to DSIH when it knew or

reasonably should have known that DSG was insolvent."); *id.* ¶ 198-202, 254.  And to support

that showing, the Debtors have argued that Diamond's analysis of its own solvency was

unreasonable.  *See, e.g.*, MTD Opp. at 77-78 (explaining that the Debtors' theory rests on using

"circumstantial evidence" to prove that Sinclair's projections were unreasonable in order to

prove that Diamond was "insolvent at the time the challenged distributions were made").  Thus,

the reasonableness of Diamond's analysis of its financial condition at the time of the challenged

transactions is indisputably relevant.

38.     Nevertheless, MLB and the Teams have refused to respond to several requests that bear on Diamond's financial condition and solvency, and its contemporaneous analyses of the same.  Specifically, MLB RFP Nos. 1, 2, 3 and 7 (and Teams RFP Nos. 1, 2, 3, 4, and 8) seek information directly relating to Diamond's financial condition, and MLB RFP Nos. 3 and 7 (and Teams RFP Nos. 3, 4 and 8) seek information regarding the negotiations for distribution rights that, if successful, could have materially improved Diamond's financial condition.

39.     When "evaluating a company's financial condition," a court "should consider contemporaneous evidence" including "opinions by contemporaneous market participants." *Kipperman v. Onex Corp.*, 2010 WL 11505688, at *12 (N.D. Ga. Sept. 29, 2010).  Third-party valuations are, in fact, more likely to be found by courts to be "sufficiently reliable" precisely because they are made contemporaneously by an outside party and "not made in anticipation of litigation."  *In re SemCrude, L.P.*, 2013 WL 2490179, at *10 (Bankr. D. Del. June 10, 2013).

40.     Contemporaneous evidence from third-parties is especially relevant in assessing "fraudulent transfer claim[s]," because "[t]he critical question is whether the company's then-existing projections were reasonable and prudent when made."  *In re Plassein Int'l Corp.*, 2008 WL 1990315, at *8 (Bankr. D. Del. May 5, 2008).  In assessing those projections, "a powerful indication of contemporary, informed opinion as to value comes from private investors who with their finances and time at stake, and with access to substantial professional expertise, concluded at the time that the business was indeed one that could be profitably pursued."  *Id.* (cleaned up).

41.     MLB and the Teams are key players in this dispute and are likely to possess information relevant to Diamond's financial condition, and specifically the value of its key assets.  MLB was narrowly outbid in Sinclair's August 2019 acquisition of Diamond and, by virtue of the analysis done as part of its $9.6 billion bid, MLB is uniquely situated to provide

relevant, objective information concerning Diamond's financial condition and the value of its assets.  Importantly, the acquisition—and MLB's objective, contemporaneous assessment—was close in time to many of the challenged distributions, with major distributions occurring in December 2019, January 2020, and August 2020.  Compl. ¶ 192. ████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████

42.     MLB and the Teams also possess relevant information because of their roles as key business partners during the relevant time period, specifically with respect to the distribution rights critical to Diamond's business.  If Diamond's close business partners—who had a keen interest in its continued performance as a broadcast partner—did not project Diamond was or would soon become insolvent, that would tend to disprove that Sinclair was unreasonable in its understanding of Diamond's financial condition.  Similarly, if the Teams (or MLB) understood that the negotiations of Diamond's critical distribution rights were proceeding favorably, that would tend to support a positive internal outlook within Diamond, which would, in turn, support the reasonableness of internal Diamond projections showing that the company was solvent when the challenged transactions occurred.  Thus, these parties' objective, contemporaneous assessments are relevant to whether Diamond's own assessments of its financial conditions and prospects were reasonable at the time.

43.     To justify their refusal to respond to these requests, MLB and the Teams argued

that only internal solvency assessments are relevant, and assessments made by outside parties are irrelevant as a matter of law.  There is no support for this artificial distinction.  Rather, as *In re Plassein International Corporation* holds, outside views are clearly relevant to understanding the contemporaneous reasonableness of Sinclair's solvency assessments.  2008 WL 1990315 at *8.

44.     MLB and the Teams' cases are not to the contrary.  *In re Energy Future Holdings Corporation* recognizes that third-party valuations can be relevant, but denied the discovery sought there because a debtor sought discovery from noteholders actively participating in negotiating a plan in the context of a makewhole claim—in which only valuation at the time of the litigation is relevant.  Notably, the court distinguished *In re Plassein International Corporation* because there third-party analyses were relevant "*to determine the reasonableness of proposed business plans*, rather than expert analyses on the current valuations.*"  513 B.R. at 662 (emphasis added).  Just so here, where Sinclair seeks independent contemporaneous analyses and evidence that bears directly on reasonableness at the time of the challenged distributions.

45.     MLB's other cases do not establish that Sinclair's requests seek entirely irrelevant information.  In *In re Morreale Hotels LLC*, the court ruled only that one discovery request seeking subjective views of solvency sought irrelevant materials.  517 B.R. 184, 201 (Bankr. C.D. Cal. 2014).  Here, Sinclair only seeks objective data and assessments.  Finally, *In re HDD Rotary Sales, LLC,* 499 B.R. 542, 551 (Bankr. S.D. Tex. 2013), stands for the unremarkable proposition that a debtor's financial records are relevant.  Nowhere does the court state that those records are the *only* relevant materials.  Indeed, the court favorably cited a Second Circuit case explaining the broad scope of material relevant to solvency determinations.  *Id.* (citing *In re Roblin Industries, Inc.*, 78 F.3d 30 (2d Cir. 1996)).

### B. MLB and the Teams Have Made No Showing that the Requests Are Burdensome

46.    Because the Requests seek relevant information, MLB and the Teams must show that responding to the Requests would nevertheless impose an undue burden.  *In re Wade*, 2012 WL 5449308 at *4.  They have made no effort to do so.

47.    After lodging a blanket objection and agreeing to produce nothing, the parties met and conferred.  In those discussions, MLB and the Teams strained to dispute relevance and argued, irrelevantly, about the weight the evidence sought should be given.  But they did not meaningfully argue in their correspondence or the meet and confers that the burden or expense of the requests was too high, let alone substantiate any burden.  Instead, MLB and the Teams merely invoked the word "burdensome" in passing without any substantive explanation; but "[a] mere statement by a party that a request is 'overly broad and unduly burdensome' is not adequate to voice a successful objection."  *In re Adkins Supply, Inc.*, 555 B.R. at 590 (citing *S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006)).  "Rather, a party resisting discovery has the burden of showing specifically how, despite the broad and liberal construction afforded the federal discovery rules," each discovery request "is overly broad, burdensome or oppressive." *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102 (S.D.N.Y. 2013) (cleaned up).

48.    Regardless, the requests are narrowly tailored and the discovery sought is proportionate to the stakes.  This is a $1.5 billion dispute involving highly sophisticated parties; the requests are important to the matter at hand; MLB and the Teams have many unique documents not in the possession of other parties; and Sinclair carefully limited the number and scope of its requests.  These factors all favor a finding of proportionality.  *See* 2018 WL 6132045 at *6-7.

## CONCLUSION

49.     For the foregoing reasons, the Court should transfer this motion to the issuing

court or compel MLB to respond to Sinclair's subpoenas in full.


Respectfully submitted,

December 5, 2023

**HOLWELL SHUSTER & GOLDBERG LLP**

 /s/ Scott M. Danner
Michael S. Shuster
mshuster@hsgllp.com
Scott M. Danner
sdanner@hsgllp.com
Lauren Cole
lcole@hsgllp.com
425 Lexington Avenue
New York, NY 10017
(646) 837-5151

*Attorneys for Sinclair Broadcast Group, Inc.*